FILED
2021 Aug-25 PM 02:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LORI AMANDA CRAPPS,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | ______________________ |
| **LINCOLN LIFE ASSURANCE COMPANY OF BOSTON,** | ) | |
| | ) | |
| | ) | |
| **DEFENDANT.** | ) | |
| | ) | |

## COMPLAINT

Plaintiff Lori Amanda Crapps ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by Lincoln Life Assurance Company of Boston ("Lincoln Life") in connection with the provision of ERISA-governed disability benefits under a group insurance plan sponsored by Plaintiff's former employer, Baptist Health System, Inc. In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to herself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys:

## INTRODUCTORY STATEMENT

1. This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA"). This suit is brought pursuant to 29 U.S.C. § 1132(a) to secure disability benefits due to Plaintiff through the group insurance policies sponsored by Baptist Health System, Inc.

2. The Plaintiff seeks all benefits to which she may be entitled should this Court determine she is "disabled," including long-term disability benefits under policies issued or administered and underwritten by Lincoln Life.

3. Plaintiff seeks such benefits together with any other disability-related benefits her plan may provide based on the conditions documented in her medical records. These conditions include rheumatoid arthritis, fibromyalgia, migraines and IBA that together leave Plaintiff in a constant state of pain, joint stiffness and fatigue.

4. Plaintiff also suffers from periodic paralysis caused by a rare neurological condition. When this paralysis occurs, Plaintiff is unable to engage safely in any activity other than being flat on her back or in a reclined position.

## JURISDICTION

5. Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an

"employee pension plan" as those terms are defined within 29 U.S.C. § 1001, et. seq. The Plan "may be found" within this district.

6. Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and diversity of citizenship exists between the parties.

7. Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District and Defendant may be found or resides in this District.

**PARTIES**

8. Plaintiff Lori Amanda Crapps, a resident and citizen of this District, is a participant in the Plan and thus entitled to benefits available thereunder.

9. Defendant Lincoln Life Assurance Company of Boston ("Lincoln Life") is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

10. Lincoln Life is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

11. One of Lincoln Life's designated agent for service of process is:

Lincoln Life Assurance Company of Boston
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

12. Lincoln Life is an entity exercising authority or control respecting the management or disposition of Plan assets or the personnel exercising said authority over Plan assets.

13. Lincoln Life is an entity providing services to The Plans at issue.

14. Lincoln Life is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

**THE PLAN**

15. The Baptist Health System, Inc. Long Term Disability ("LTD") plan is funded entirely by a long-term group insurance policy sold by Lincoln Life, the company which also underwrote this group policy.

16. This group policy was purchased by Plaintiff's employer to confer certain benefits upon Plaintiff and other employees.

17. As a result, these policies qualify as employee welfare benefit plans as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under the Plans as that term is used in 29 U.S.C. § 1132.

18. Under the terms of this LTD Plan providing for certain benefits accruing upon the Plaintiff becoming disabled, Plaintiff is "disabled" as this Plan defines that term, which is as follows:

Applicable to Class 3, 4, 5, 6, 7, 8, 9, 10, 11, 12:

b. i. if the Covered Person is eligible for the 24 Month Own Occupation benefit, "**Disability**" or "**Disabled**" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

19. The part of the disability definition applicable to Plaintiff in this case is that which relates to "Any Occupation," which the policy defines as follows:

"**Any Occupation**" means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.

20. There are no Plan documents made available indicating that Lincoln Life has an enforceable grant of discretionary authority as Plan or Claims Administrator or that any express delegation has occurred for this Plan.

## LINCOLN LIFE'S LIABILITY

21. Plaintiff, a former employee of Baptist Health System, Inc, began working as a Registered Nurse within the Cardiac Unit at Princeton Hospital in Birmingham, Alabama, in June 2014.

22. Starting around December 2014, Plaintiff began experiencing paralysis with aphasia, numbness, weakness, pain all over her body, hearing problems, and ataxia. She also began having problems with memory, cognition, pace, attention and concentration.

23. Despite these ominous developments, Plaintiff continued to work as a nurse, which she had considered to be her life's calling.

24. These episodes continued into the following year, leading to Plaintiff ceasing work because of the impact sudden total bouts of non-function and flares of pain and fatigue had on her ability to safely perform her job as a nurse.

25. When it became evident to Plaintiff that she would not be able to continue working, Plaintiff, at the urging of her doctors and her employer, initiated a claim for disability with Lincoln Life, Baptist Health's LTD group plan insurer, on or about January 8, 2016, with a date of disability of November 1, 2015 when she experienced an episode of full-body paralysis and was then hospitalized for several days.

26. At that time, Plaintiff's physicians were unable to ascertain a physical cause or disease process that explained her symptoms, and suggested she possibly could have been suffering from a conversation disorder with associated depression and anxiety, or alternatively, a possible neurological disorder.

27. As a result, Lincoln Life initially classified Plaintiff's claim as one emanating from a behavioral condition, ignoring the neurological possibility. It therefore requested an assessment from Plaintiff's psychiatrist Dr. Jayakrishna Madabushi and referred the claim for a third-party review with psychiatrist Dr. Gregory Barclay.

28. In a report dated February 18, 2016, Dr. Barclay concluded that the claim should not be paid because in his view the records that were made available

to him at that time did not document "cognitive or functional impairment due to mental illness…."

29. After receipt of Dr. Barclay's report, Lincoln Life continued pursuing additional records, so it did not immediately issue a decision at that time. After obtaining additional records, Liberty Life sought an additional third-party "peer review" through the Medical Consultant Network ("MCN"). MCN arranged for this peer review to be performed by psychiatrist Dr. Rachel Sullivan, M.D.

30. Dr. Sullivan concluded in her report dated March 4, 2016, that the evidence before her at that time supported impairment because of Plaintiff's documented inability to perform "some basic activities of daily living…."

31. Dr. Sullivan ultimately concluded that Plaintiff could not work even in a sedentary capacity on more than a part time basis.

32. Lincoln Life determined based on this finding that Plaintiff was disabled at that time under the terms of the group policy and approved the commencement of Plaintiff's benefit as of February 1, 2016.

33. On June 17, 2016, Lincoln Life, upon obtaining updated records, renewed its approval again finding that Plaintiff "would only be able to work part-time sedentary" and noted the necessity of a new review between 2 and 4 months away.

34. At this same time, Lincoln Life began closely tracking the status of

Plaintiff's application for Social Security Disability benefits ("SSDI"), noting in a claim note on June 20 that Plaintiff had applied for that benefit but was pursuing an appeal through Doherty & Associates.

35. Doherty & Associates is a Lincoln Life vendor retained in this instance by the company to assist Plaintiff with her pursuit of SSDI, which once awarded would decrease the amount of Lincoln Life's benefit obligation under the Plan.

36. In November 2016, although there was no material change in the records or assessments for Plaintiff up to that time, Lincoln Life decided to terminate Plaintiff's benefit citing what it determined to be a lack of appropriate treatment. That determination, however, occurred after Lincoln Life elected not to continue pursuing certain records that would have showed additional care.

37. Citing the existence of these additional records, Plaintiff, on her own, endeavored to have Lincoln Life reopen her LTD claim by submitting an appeal as she had been instructed to do. Plaintiff included with her appeal additional records and materials.

38. In a May 11, 2017, claim note, Lincoln Life nurse Tiffany Long, after reviewing the new medical information then made available, noted Plaintiff had a history of "muscle weakness, muscle pain and fibromyalgia." She also noted Plaintiff had seen a neurologist and a rheumatologist and had been treated for significant joint pain and continued weakness and fatigue.

39. The additional records obtained by Lincoln Life at that time therefore began to explain for the first time that Plaintiff's functional limitations were primarily physical in nature, and that previously identified psychological issues were actually secondary to these since-confirmed disease processes.

40. The claim was reopened in May 2017 and payment again resumed.

41. Three months later, Lincoln Life again initiated a new review of Plaintiff's continuing eligibility for LTD benefits.

42. As it had done before, it requested another peer review from MCN in September 2017.

43. This time, the peer review being requested was from a neurologist.

44. In that peer review, Dr. Jon Glass, who identified himself as being Board certified in neurology, concluded in a report dated September 1, 2017, that there was "no neurologically disabling condition," and that he could not comment on Plaintiff's psychiatric diagnoses.

45. Based on that opinion on Plaintiff's records, Lincoln Life informed Plaintiff that her claim was once again being terminated in a letter dated September 15, 2017.

46. After Lincoln Life informed of this latest termination, Plaintiff quickly noticed that Dr. Glass's report was fatally incomplete because Dr. Glass had not been given all of Plaintiff's most recent treatment records that continued to show the

physical nature of her conditions. When she brought this procedural defect to Lincoln Life's attention, Lincoln Life reopened the claim and commenced yet another review.

47. In this new review that had to take into account the additional records that previously had been ignored in Dr. Glass's report, Lincoln Life finally admitted for the first time in a clear fashion that Plaintiff's functional limitations arose out of neurological and rheumatological disorders, not out of a mental or nervous disorder.

48. Specifically, Lincoln Life, through its nurse, acknowledged that Plaintiff had been diagnosed with Normokalemic periodic paralysis, a rare neuromuscular disorder characterized by episodes of significant muscle weakness.

49. It was also acknowledged that Plaintiff had been objectively diagnosed as having inflammatory polyarthropathy and fibromyalgia, among other issues, that further explained the lack of function observed in previous Lincoln Life reviews.

50. In light of these records and this internal medical evaluation, Lincoln Life found Plaintiff's medical evidence to continue to support her ongoing claim through at least January 2018 based on the aforementioned conditions, and especially Plaintiff's rheumatological condition.

51. This determination, however, was only effective through January 29, 2018, when the policy's definition of disability ceased reliance on Plaintiff's ability to continue performing her "Own Occupation" and switched over to a more

restrictive disability definition that required Plaintiff to be disabled from "Any Occupation" instead.

52. But because Lincoln Life's review of "any occupation" benefits had not yet been completed as of January 31, 2018, Lincoln Life decided to pay Plaintiff's claim under a reservation of rights until an "any occupation" determination could be completed.

53. This "reservation of rights" status did not last long; on February 9, 2018, Plaintiff was found to be qualified for benefits under the group policy's any occupation" standard based on a determination that her records and assessments from her providers supported the conclusion that because of Plaintiff's inflammatory polyarthropathy, chronic migraine, and irritable bowel syndrome, Plaintiff was unable to sit, stand or walk for more than 30 minutes at a time without a break, could not type, file, or perform fine motor tasks at all, and could not lift, carry, push or pull any weight.

54. In other words, Lincoln Life found that Plaintiff's records supported the finding that she could not perform even a sedentary capacity fulltime, just as it had found since the beginning.

55. A few weeks later, Plaintiff, who was just 34 years old at the time, likewise was found to be qualified for Social Security Disability, and therefore unable to follow any gainful activity within the national economy.

56. Once Lincoln Life learned of this finding, it became instantly interested in the amount of Plaintiff's SSDI recovery, but wholly disinterested about the reasons Plaintiff was able to obtain that recovery. In this regard, Lincoln Life requested and obtained Plaintiff's award information from its vendor, but elected not to request a copy of the decision itself or of the disability evidence that led to that decision.

57. Over the next several months, commensurate with its expressed interests, Lincoln Life doggedly pursued Plaintiff for the amount of overpayment it had calculated to have occurred due to Plaintiff being found disabled and entitled to SSDI benefits.

58. The following year, Lincoln Life commenced another review. At first, Lincoln Life indicated to Plaintiff that it wished to have her evaluated through an independent medical evaluation ("IME") process described in the policy, but it eventually abandoned that request and instead elected to continue its reliance on medical record reviews.

59. But as it commenced this new review, Lincoln Life did move forward with *60 hours* of clandestine surveillance of Plaintiff by a private investigator from ISG.

60. The report from the investigator hired by Lincoln Life revealed absolutely no activity by the Plaintiff over this 60 hours of observation that was

inconsistent with her having a less than sedentary capacity.

61. In fact, for the entire 60 hours of surveillance, *there was no activity at all*, with Plaintiff rarely leaving the house as she had previously reported to be her typical day.

62. This next medical record review was performed in July 2019 by Dr. Kathy Dennis Yawingu. This review, however, did not include prior assessments performed by earlier reviewers that had found Plaintiff to lack a fulltime sedentary capacity.

63. Lincoln Life instead sanitized the scope of Dr. Yawingu's review by withholding those materials and not asking her to comment whether there was evidence of substantial medical improvement since Lincoln Life's last review supportive of the Plaintiff.

64. Lincoln Life then commissioned a "Transferrable Skills Analysis" ("TSA") to identify alternative occupations for Plaintiff. These identified occupations included "Admitting Officer," "Cardiac Monitor Technician," "Hospital Admitting Clerk," and "Order Control Clerk, Blood Bank," all of which are sedentary level occupations where computer usage and keyboarding is a central requirement.

65. All of these identified occupations were based on wage levels that Lincoln Life's vocational evaluator determined to be "mean" wages, and not entry

level, that being the level that would have applied to Plaintiff who would have had to start each identified occupation anew.

66. Thereafter, Lincoln Life moved forward with terminating and closing Plaintiff's LTD claim as of July 22, 2019, on these grounds, informing Plaintiff of the same in a letter dated July 24, 2019.

67. That letter, which has many errors, is especially notable for its statement that "we have fully considered the Social Security Administration's ruling," when the claim record indicates that it did not even *possess* that ruling and further had not even requested it from either the SSA or its own vendor.

68. Plaintiff, again without counsel, appealed the determination in a written submission sent October 3, 2019, and included with her submission a number of records and materials from her providers, including in particular her rheumatologist who had documented many times over in her charts that his examinations showed her to have tenderness and observable pain in her hands and fingers, and occasionally in other areas as well.

69. When Plaintiff did not hear back from Lincoln Life after a few months, she called to follow up about the status of her appeal and was told that Lincoln Life did not have her paperwork in its system, suggesting that it had misplaced it. As a result, Plaintiff resubmitted her appeal in April 2020.

70. As before, Lincoln Life elected to forego any personal examination of

the Plaintiff and instead pursued medical record reviews through vendor "peer reviewers."

71. This time, Lincoln Life went through an entity called Network Medical Review ("NMR") to arrange for the engagement of a physician specializing in internal medicine and rheumatology.

72. Dr. Alfred Becker, the NMR rheumatologist/internist, wrote in a report dated May 15, 2020, that he found "no clinical evidence of synovitis, inflammatory arthropathy, muscle weakness, deformities, decreased range of motion, difficulty with gripping, or other musculoskeletal clinically relevant findings supporting functional impairment."

73. At the same time Lincoln Life engaged NMR, it also engaged ECN, another vendor, to procure the review services of a neurologist. ECN, in turn, tapped Dr. Jonathan Marehbian, who was certified in Neurology, to perform the review.

74. Dr. Marehbian concluded in his report dated May 28, 2020, that Plaintiff's records did not support a finding of any functional limitations from a neurological perspective

75. Three days later, Dr. Marehbian issued an addendum to his report after obtaining additional information from Dr.Dixon, one of Plaintiffs providers. Based on this additional information, Dr. Marehbian found evidence to support significant restrictions and limitations after all which include the following:

standing – 1 hour at a time. 2 hours a day total
walking – 1 hour at a time. 2 hours a day total

lifting– occasionally up to 20 lbs.
carrying -occasionally up to 20 lbs.
pushing– occasionally up to 20 lbs.
pulling– occasionally up to 20 lbs.
climbing stairs - occasionally
stooping - occasionally
kneeling - occasionally
crouching - occasionally
crawling - never
Sitting - unrestricted
Reaching – occasionally all levels bilaterally
use lower extremities for foot controls - occasionally
Fine manipulation - occasionally
Simple and firm grasping - occasionally

No climbing ladders. working at unprotected heights.
Use of computers or phones up to 10 minutes at a time. no more than 4 hours total a day.

76. Based on this addendum, Lincoln performed a second post-appeal TSA that identified only three suitable occupations for Plaintiff: "Cardiac Monitor Technician," "Tourist Information Assistant," and "Information Clerk."

77. Lincoln Life provided these reviews to Plaintiff for comment in a package sent to Plaintiff on June 12, 2020.

78. Plaintiff responded to these reviews by providing updated records and her statement explaining what she feels from day to day and her daily routine because of her conditions.

79. Unfazed, Lincoln Life denied Plaintiff's appeal in a letter dated January

5, 2021.

80. As before, the appeal denial did not *actually* take into account any SSDI determination, because the record shows Lincoln Life never even obtained that decision or the file supporting it.

81. The appeal decision also was internally inconsistent, in that the jobs identified by its vocational expert were each inconsistent with the functional limitations identified by its own reviewer Dr. Marehbian.

82. Further, the decision's reliance on Dr. Becker was questionable because Dr. Becker openly stated that there were no clinical findings relating to Plaintiff's joint pain, when Plaintiff's records included detailed assessments and diagrams her rheumatologist had completed after each examination confirming impairment.

83. The decision also did not address how the surveillance that had been conducted had fully corroborated Plaintiff's credibility in her description of her functionality.

84. And finally, nowhere does the letter or any internal review undertaken by Lincoln Life indicate the existence of medical evidence showing substantial medical improvement in the Plaintiff's condition. In fact, Plaintiff's records and assessments instead show a consistent decline in her condition since Lincoln Life first found her to be unable to perform anything above parttime sedentary work. This is evidence of a rudderless claim process leading to inconsistent and biased decision-

making.

85. Lincoln's administration of this claim involves numerous other regulatory and plan breaches and errors, including:

(a) The failure to maintain adequate claims procedures, or any procedures *at all*, in compliance with Department of Labor regulations;

(b) The targeting of Plaintiff's claims for denial because ERISA governs;

(c) The failure by Lincoln to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(d) The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of her claim;

(e) Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all her claim;

(f) Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

(g) Failing to accord any weight to Plaintiff's medical providers and other examiners who personally examined the Plaintiff, some on a regular basis;

(h) Failing to give proper consideration to Plaintiff's Social Security disability determination in accordance with Eleventh Circuit precedent, especially in light of the similarity of the SSA's standard to the Lincoln Life "Any Occupation" standard;

(i) Failing to issue a timely decision as required under Plan terms and Department of Labor regulations; and

(j) Failing to give Plaintiff's claim a full co-morbid review and give any consideration to how her conditions impacted one another.

86. Despite Plaintiff's established disability and entitlement to coverage under the terms of the LTD Plan, Lincoln Life continues to consider Plaintiff not to be "disabled" and unqualified for LTD benefits.

87. As set forth above in connection with Lincoln Life's fiduciary breaches, Lincoln Life's claim decision was the product of a conflict of interest whereby it allowed its own financial interests to supersede its fiduciary obligations to Plaintiff.

Under *Glenn*, this presents an additional reason for application of a *de novo* standard to their claim decision.

88. This conflict of interest further calls into question the credibility of Lincoln Life's claims personnel and reviewers who behaved dishonestly and who openly defied Plan terms and Department of Labor regulations.

89. Lincoln Life considered the applicability of ERISA before making its decision. This presents an additional reason for application of a *de novo* standard to their claim decision.

90. Lincoln Life did not provide Plaintiff with a meaningful opportunity for a full and fair review of this claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1, and instead actively tried to subvert Plaintiff's ability to protect her right to such a review.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lori Amanda Crapps respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a. For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the Plan and Policy, as well as all prejudgment interest due thereon as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b. For a judgment against the Defendant awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1);

c. For an order requiring Defendant to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan(s); and

d. Such other relief as may be deemed just and proper.

Respectfully submitted,

M. Clayborn Williams (ASB-9101-A43M)
**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com

**Plaintiff's Address:**

Lori Amanda Crapps
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendants' Address:**

Lincoln Life Assurance Company of Boston

c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104